**FILED**

JUL 2 8 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICHOLAS SPAETH, )<br>818 West 56th Street, )<br>Kansas City, MO 64113, )<br> )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>MICHIGAN STATE UNIVERSITY )<br>COLLEGE OF LAW, )<br>368 Law College Building, )<br>East Lansing, MI 48824, )<br> )<br>Defendants ) | Case: 1:11-cv-01376<br>Assigned To : Huvelle, Ellen S.<br>Assign. Date : 7/28/2011<br>Description: Employ. Discrim. |

JURY ACTION

## COMPLAINT

### Preliminary Statement

1.      Plaintiff Nicholas Spaeth files this action against Defendant Michigan State

University College of Law seeking redress for age discrimination under the Age Discrimination

in Employment Act, 29 U.S.C. § 621 *et seq.* Plaintiff, who was born in 1950, applied for a

teaching position at the Michigan State University College of Law beginning during the 2011-

2012 academic year. Despite Plaintiff's exemplary qualifications, Defendant did not offer him

one of its 24 interview slots at the Faculty Recruitment Conference hosted by the Association of

American Law Schools in Washington, D.C. As a result, Defendant did not offer Plaintiff a job

for the 2011-2012 academic year. Instead, Defendant hired three individuals, all of whom are

decades younger than Plaintiff, whose qualifications are significantly inferior to Plaintiff's

qualifications.

## Jurisdiction and Venue

2.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

3.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391.

4.      Plaintiff timely filed a Charge of Discrimination, Charge No. 560-2011-01130, against Defendant with the Equal Employment Opportunity Commission ("EEOC") on March 13, 2011.

5.      The EEOC issued Plaintiff a Notice of Right to Sue on Charge No. 560-2011-01130 on April 29, 2011.

## Parties

6.      Plaintiff Nicholas Spaeth is a citizen of the State of Missouri who is domiciled at 818 West 56th Street, Kansas City, Missouri  64113.

7.      Defendant Michigan State University College of Law ("Michigan State") is a registered nonprofit corporation located at 368 Law College Building, East Lansing, Michigan 48824.

## Factual Allegations

8.      The Association of American Law Schools ("AALS"), located in Washington, D.C., is a non-profit educational association of 172 law schools representing over 10,000 law faculty in the United States.

9.      The AALS coordinates the majority of the law school hiring in the United States. Individuals applying for law school teaching positions pay a fee to submit their application information to the AALS through its Faculty Appointments Register.  The AALS provides member law schools with applicants' information and sends applicants advertisements for teaching positions at law schools via its Placement Bulletin.

10. The AALS sponsors a Faculty Recruitment Conference, held every fall in Washington, D.C., at which law schools have the opportunity to interview applicants.

11. An interview at the Faculty Recruitment Conference is ordinarily a prerequisite to being hired to teach at a law school.

12. Defendant's posting in the AALS's October 2010 Placement Bulletin stated, "[Michigan State] . . . expects to be making several . . . appointments this year, and therefore seeks exceptional entry level and lateral candidates in all areas, especially for first year courses and tax . . . . Applicants should have distinguished academic records, demonstrated teaching ability or relevant work experience, and an established record of scholarly achievement."

13. Defendant places a particular emphasis on practical experience when hiring law faculty. Its website states that its "faculty are high-quality *experienced professionals* whose mission is to provide MSU Law students with a *practical legal education*" (emphasis added).

14. On or about October 15, 2010, Plaintiff applied for a teaching position at Michigan State through the Faculty Appointments Register.

15. The Faculty Appointments Register form that Plaintiff submitted to Defendant listed a law school graduation date of June 1977.

16. Defendant interviewed 24 applicants at the Faculty Recruitment Conference held from October 28, 2010 through October 30, 2010.

17. Defendant chose not to interview Plaintiff at the Faculty Recruitment Conference.

18. Defendant hired three applicants for teaching positions beginning during the 2011-2012 academic year.

19. Defendant interviewed all three successful applicants at the Faculty Recruitment Conference.

20.    Plaintiff was exceedingly well-qualified for a teaching position with Defendant.

21.    Plaintiff graduated *magna cum laude*, Phi Beta Kappa from Stanford University in 1972.

22.    Plaintiff was awarded a Rhodes Scholarship and earned a Master's Degree from Oxford University in Politics, Philosophy, and Economics, graduating with First Class Honors (*summa cum laude*) in 1974.

23.    Plaintiff attended Stanford Law School, the third-ranked law school in the country, and graduated in 1977, having served as the Managing Editor of the Stanford Law Review.

24.    Plaintiff served as a law clerk to Judge Myron Bright of the Eighth Circuit Court of Appeals from 1977 to 1978.

25.    Plaintiff served as a law clerk to Justice Byron White of the United States Supreme Court from 1978 to 1979.

26.    Plaintiff has over thirty years of high-level experience as a legal practitioner.

27.    From 1979 to 1985, Plaintiff was a trial lawyer with an emphasis on commercial disputes. He worked as an associate at the law firm of Faegre & Benson LLP for two years, then worked as a partner at the Vogel Law Firm for four years. During this time, he acted as first chair in dozens of trials and appeals.

28.    In 1984, Plaintiff was elected to serve as North Dakota's State Attorney General, and he served two consecutive four-year terms, from 1985 to 1989 and from 1990 to 1993.

29.    As North Dakota's State Attorney General, Plaintiff was the state's chief lawyer and prosecutor, managing a large legal staff with critical civil, criminal, and regulatory responsibilities.

30.     As North Dakota's State Attorney General, Plaintiff represented the state in significant consumer affairs, antitrust, and regulatory disputes; led the state's oil and gas regulatory commission; directed the state-owned bank and the state housing finance agency; and argued approximately two dozen groundbreaking appellate cases and three cases before the United States Supreme Court, including *Quill v. North Dakota*, one of the most important tax cases to reach the Supreme Court in the twentieth century.

31.     Plaintiff worked as a corporate lawyer from 1993 to 2000: as a partner at Dorsey & Whitney LLP from 1993 to 1997, and as a partner at Cooley Godward LLP from 1997 to 2000. His practice was focused on securities, antitrust, contracts, mergers and acquisitions, intellectual property, and the financial services sector.

32.     From 2000 to 2003, Plaintiff served as the Senior Vice President, General Counsel, and Secretary of the GE Employers Reinsurance Corporation, a publicly held conglomerate of several dozen insurance companies that collectively were among the largest in the world, with approximately $25 billion in assets.

33.     As the Senior Vice President, General Counsel, and Secretary of the GE Employers Reinsurance Corporation, Plaintiff supervised a staff of 175 lawyers; oversaw business operations with a focus on legal, claims, risk management, government and regulatory relations, and compliance; managed SEC reporting and Sarbanes-Oxley ("SOX") compliance; coordinated several major acquisitions and divestitures; successfully negotiated a $1 billion commutation with a bankrupt insurer; and led Six Sigma initiatives in claims, underwriting, legal process management, and contract creation. He sat on the boards of directors of German and British insurance companies; managed board matters and corporate matters for the German and British companies; and acted as the liaison for U.S., German, and British tax and regulatory

5

authorities on behalf of those companies.

34.     From 2003 to 2004, Plaintiff served as the Senior Vice President, General

Counsel, and Secretary of Intuit, Inc., a Fortune 500 software company.

35.     As Senior Vice President, General Counsel, and Secretary of Intuit, Inc., Plaintiff

oversaw the strategic operations of the company and its subsidiaries; reported to the company's

board and corporate secretary; managed the company's legal, privacy, government affairs, and

security functions; led major initiatives in privacy and data protection; and played a central role

in reforming the company's intellectual property protection system.

36.     From 2003 to 2007, Plaintiff served as the Senior Vice President, Law and Public

Policy, and Chief Legal Officer of H&R Block, Inc., a Fortune 500 financial services company

and the largest tax preparation company in the world.

37.     As Senior Vice President, Law and Public Policy, and Chief Legal Officer of

H&R Block, Inc., Plaintiff was responsible for the company's legal, government affairs, risk,

external relations, mergers and acquisitions, and tax compliance operations.

38.     As Senior Vice President, Law and Public Policy, and Chief Legal Officer of

H&R Block, Inc., Plaintiff supervised a staff of 45 lawyers and supervised three major

acquisitions and the chartering of a *de novo* thrift by the Office of Thrift Supervision; served on

the steering committee of the company's SOX compliance team; participated in all board and

committee meetings; and was closely involved in major regulatory issues with the Securities and

Exchange Commission, the Office of Thrift Supervision, and state, national, and international

regulators.

39.     As Senior Vice President, Law and Public Policy, and Chief Legal Officer of

H&R Block, Inc., Plaintiff supervised the company's regulatory compliance issues related to a

major subprime lender subsidiary, Option One, and managed risk mitigation, capital markets transactions, and issues related to restatement of financials; managed the defense of several consumer class actions in addition to securities and derivative litigation stemming from restatement of financials; created a new work flow and records management process that was implemented nationwide; reviewed the performance of outside counsel and other expenses to reduce the company's expenditures; created a financial service product review process to minimize the company's risk; and oversaw the company's SEC repository function.

40.     From 2007 to 2009, Plaintiff served as the Executive Vice President, Chief Legal Officer, and Chief Risk Officer of the Federal Home Loan Bank of Des Moines.

41.     As Executive Vice President, Chief Legal Officer, and Chief Risk Officer of the Federal Home Loan Bank of Des Moines, Plaintiff served as one of five senior executives at a major Government Sponsored Enterprise with a balance sheet of over $80 billion and the major source of bank liquidity in a five-state region.

42.     As Executive Vice President, Chief Legal Officer, and Chief Risk Officer of the Federal Home Loan Bank of Des Moines, Plaintiff managed all aspects of the bank's legal affairs, compliance, and strategic, market, credit, and operation risk; set up a best-in-class Enterprise Risk Governance Structure; developed real-time risk reporting templates that captured market, credit, operations, and strategic risks, and documented them for board, executive, and regulatory review; oversaw dynamic hedging and asset liability matching strategies for over $20 billion in an interest rate sensitive mortgage portfolio; oversaw the bank's credit risk function and managed the bank's overall asset portfolio; supervised the implementation of SOX processes; managed legal functions such as SEC public reporting, ongoing employment, contract, and corporate issues; integrated a large number of corporate policies into one

comprehensive internal policy document; oversaw regulatory examinations; and served as a liaison with regulators in the wake of the Housing and Economic Recovery Act of 2008.

43.    Plaintiff also served as the Chair of the American Bar Association's Amicus Curiae Committee, worked as an election judge in the Republic of Bosnia and on various other governmental advisory groups, and often gave presentations in his areas of expertise, including corporate governance, corporate finance, corporate reorganizations, tax, SOX compliance, and regulatory law.

44.    In addition to his over thirty years of experience as a legal practitioner, Plaintiff has four years of law school teaching experience.  He served as an adjunct professor of law at the University of Minnesota Law School from 1980 to 1983, and he served as a visiting professor of law at the University of Missouri School of Law during the 2010-2011 academic year.

45.    Plaintiff also has an impressive scholarly record.  He edited the *American Indian Law Deskbook* and authored numerous other publications.  He filed over forty amicus briefs with the United States Supreme Court and argued groundbreaking cases before the United States Supreme Court on three separate occasions.  He also delivered a paper at the Kremlin comparing the U.S. and Soviet legal systems;  published a major task force study addressing the process of choosing federal judges; wrote a series of internal papers on credit risk, interest rate risk, and the mortgage crisis for the Federal Home Loan Bank System; and published many other articles in newspapers and legal publications.

46.    Defendant hired three new professors to begin during the 2011-2012 academic year, all of whom are significantly less qualified than Plaintiff.

47.    On information and belief, all of the individuals that Defendant hired are decades younger than Plaintiff.  The first hire graduated from law school in 2006, the second hire

graduated from law school in 2001, and the third hire graduated from law school in 2005.

48.    Defendant's first hire was hired to teach contracts, corporate income taxation, and partnership taxation, areas in which Plaintiff is an expert.

49.    The qualifications of Defendant's first hire are significantly inferior to Plaintiff's qualifications.

50.    Defendant's first hire graduated from a less prestigious law school than Stanford Law School.

51.    Defendant's first hire did not serve as a law clerk. Plaintiff clerked on the Eighth Circuit Court of Appeals and the United States Supreme Court.

52.    The practical work experience of Defendant's first hire is limited to less than three years as an associate at a law firm. Plaintiff worked as an associate at a law firm for two years, worked as a partner at three law firms for a total of eleven years (first-chairing numerous trials and appeals), and has nearly two decades of additional experience as a legal practitioner, including service as a state Attorney General and the general counsel of three publicly held companies with billions of dollars in assets. As Senior Vice President, Law and Public Policy, and Chief Legal Officer of H&R Block, Inc., the largest tax preparation company in the world, Plaintiff was responsible for the company's tax compliance and regulatory issues.

53.    It is particularly crucial for law professors who teach corporate income taxation, partnership taxation, and related subject matters to have relevant practical work experience, as those areas of expertise are more skills-based and less theoretical than other areas of the law.

54.    Defendant's first hire has only two years of law school teaching experience. Plaintiff has four years of law school teaching experience.

55.    On information and belief, Defendant's first hire had no law review publications

at the time of the Faculty Recruitment Conference.

56.     Plaintiff has extensive scholarly experience in the area of tax law, including having argued one of the most groundbreaking tax law cases in the twentieth century before the United States Supreme Court and having filed over 40 Supreme Court amicus briefs.

57.     Defendant's second hire was hired to teach administrative law and the regulatory state, areas in which Plaintiff is an expert.

58.     Defendant's posting in the AALS's October 2010 Placement Bulletin expressed no need for a professor with a focus on administrative law and the regulatory state.

59.     The qualifications of Defendant's second hire are significantly inferior to Plaintiff's qualifications.

60.     Defendant's second hire graduated from a less prestigious law school than Stanford Law School.

61.     Defendant's second hire served as a law clerk on the Supreme Court of Hawaii. Plaintiff clerked on the Eighth Circuit Court of Appeals and the United States Supreme Court, both of which are more prestigious courts than the Supreme Court of Hawaii.

62.     The practical work experience of Defendant's second hire is limited to four years as an associate at a law firm and one year as a staff attorney at a nonprofit.  Plaintiff worked as an associate at a law firm for two years, worked as a partner at three law firms for a total of eleven years (first-chairing numerous trials and appeals), and has nearly two decades of additional experience as a legal practitioner, including service as a state Attorney General and as the general counsel of three publicly held companies with billions of dollars in assets, where he was responsible for overseeing the companies' regulatory affairs.

63.     It is particularly crucial for law professors who teach regulatory law and related

subject matters to have relevant practical work experience, as those areas of expertise are more skills-based and less theoretical than other areas of the law.

64.     Defendant's second hire has three years of law school teaching experience. Plaintiff has four years of law school teaching experience.

65.     On information and belief, Defendant's second hire had no law review publications at the time of the Faculty Recruitment Conference.

66.     Plaintiff has extensive scholarly experience in the area of administrative law and the regulatory state, including having filed over 40 amicus briefs with the United States Supreme Court and having written a series of internal papers on credit risk, interest rate risk, and the mortgage crisis for the Federal Home Loan Bank System.

67.     Defendant's third hire was hired to teach criminal procedure and sports law.

68.     Defendant's posting in the AALS's October 2010 Placement Bulletin expressed no need for a professor with a focus on criminal procedure and sports law.

69.     The qualifications of Defendant's third hire are significantly inferior to Plaintiff's qualifications.

70.     Defendant's third hire graduated from a less prestigious law school than Stanford Law School.

71.     Defendant's third hire did not serve as a law clerk. Plaintiff clerked on the Eighth Circuit Court of Appeals and the United States Supreme Court.

72.     Defendant's third hire has no work experience as a legal practitioner. Plaintiff has over thirty years of work experience as a legal practitioner, including as a partner at three law firms, as a state Attorney General, and as the general counsel of three publicly held companies with billions of dollars in assets.

73.     Defendant's third hire has no law school teaching experience.  Plaintiff has four years of law school teaching experience.

74.     Defendant chose not to interview or hire Plaintiff for a teaching position beginning during the 2011-2012 academic year.

75.     If Defendant had considered Plaintiff's application based on his qualifications alone and not based on his age, it would have granted him an interview at the AALS Faculty Recruitment Conference in Washington, D.C.

76.     If Defendant had considered Plaintiff's application based on his qualifications alone and not based on his age, it would have hired him for any one of the teaching positions for which it hired.

## COUNT I

### Age Discrimination Against Plaintiff in Violation of the Age Discrimination in Employment Act

77.     Paragraphs 1 through 76 are incorporated by reference as if fully set out herein.

78.     Defendant refused to interview or hire Plaintiff because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

79.     Defendant knew, based on Plaintiff's application, that Plaintiff was over 40 years old.

80.     Defendant knew, based on the successful candidates' applications, that Plaintiff was older than the applicants to whom it granted interviews and extended employment offers for the 2011-2012 academic year.

81.     Plaintiff's qualifications are significantly superior to those of all three successful applicants.

82.     Defendant denied Plaintiff a job interview and a job offer because of his age by

giving less weight to its core criteria as stated in the Placement Bulletin ("academic record[],

demonstrated teaching ability or relevant work experience, and . . . established record of

scholarly achievement") and on its website ("experienced professionals whose mission is to

provide MSU Law students with a practical legal education") when considering Plaintiff's

application than when considering the applications of similarly situated younger applicants.

83.     Defendant denied Plaintiff a job interview and a job offer because of his age by

giving less weight to Plaintiff's academic and clerkship record than to the academic and

clerkship records of similarly situated younger applicants.

84.     All three applicants whom Defendant hired graduated from law schools that are

less prestigious than Stanford Law School.

85.     Plaintiff was the Managing Editor of the Stanford Law Review, and had superior

qualifications in this regard than two of the three successful applicants, who did not serve on a

law review.

86.     Two of the three successful applicants had no clerkship experience.

87.     The third successful applicant clerked on a relatively less prestigious court than

the courts on which Plaintiff clerked.

88.     Defendant chose not to even interview Plaintiff even though he was a Rhodes

Scholar, graduated from a more prestigious law school than the successful applicants, served as

the Managing Editor of the Stanford Law Review, and clerked on the Eighth Circuit Court of

Appeals and the United States Supreme Court.

89.     Defendant denied Plaintiff a job interview and a job offer because of his age by

giving less weight to Plaintiff's law school teaching experience than to the law school teaching

experience of similarly situated younger applicants.

13

90.    Defendant hired one applicant with no law school teaching experience, one applicant with only two years of law school teaching experience, and one applicant with only three years of law school teaching experience.

91.    Defendant chose not to even interview Plaintiff even though he had four years of law school teaching experience.

92.    Defendant denied Plaintiff a job interview and a job offer because of his age by giving less weight to Plaintiff's work experience as a legal practitioner than to the work experience of similarly situated younger applicants.

93.    Defendant hired one applicant with five years of work experience as a legal practitioner, one applicant with less than three years of work experience as a legal practitioner, and one applicant who had no work experience as a legal practitioner.

94.    Defendant chose not to even interview Plaintiff even though he had over thirty years of work experience as a legal practitioner in positions far more prestigious than the successful applicants', and even though it is particularly crucial that law professors teaching in the areas for which Defendant hired and in which Plaintiff is an expert (including corporate governance, regulatory compliance, and tax law) have practical work experience.

95.    Defendant denied Plaintiff a job interview and a job offer because of his age by giving less weight to Plaintiff's scholarly achievements than to the scholarly achievements of similarly situated younger applicants.  None of the successful applicants' scholarly achievements approached Plaintiff's, which included editing the *American Indian Law Deskbook*, filing over forty amicus briefs with the United States Supreme Court, arguing three groundbreaking cases before the United States Supreme Court, delivering a paper at the Kremlin, publishing a study on the process of choosing federal judges, writing a series of internal papers for the Federal Home

Loan Bank System, and writing many other articles in newspapers and legal publications.

### Prayer for Relief

WHEREFORE, Plaintiff Nicholas Spaeth respectfully requests that this Court grant him the following relief:

A.  Appointment to a teaching position at Michigan State University College of Law;

B.  Compensation for future lost wages and benefits suffered by Plaintiff because he was not appointed;

C.  Emotional distress damages;

D.  Other compensatory damages;

E.  Punitive damages;

F.  Attorneys' fees and costs;

G.  Pre- and post-judgment interest; and

H.  Such other relief as law and justice allow.

Respectfully submitted,

Lynne Bernabei, Esq., D.C. Bar # 938936
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
(202) 745-1942

Alan R. Kabat, Esq., D.C. Bar # 464258
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C.  20009-7124
(202) 745-1942

*Attorneys for Plaintiff Nicholas Spaeth*

Dated:  July 28, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NICHOLAS SPAETH,<br>818 West 56th Street,<br>Kansas City, MO  64113,<br><br>Plaintiff,<br><br>v.<br><br>MICHIGAN STATE UNIVERSITY<br>COLLEGE OF LAW,<br>368 Law College Building,<br>East Lansing, MI  48824,<br><br>Defendants | ))))))))))))))))) | Civil Action No. _____ |

## PLAINTIFF'S JURY DEMAND

Plaintiff Nicholas Spaeth, through undersigned counsel, demands a jury trial on all issues so triable.

Respectfully submitted,

_____
Lynne Bernabei, Esq., D.C. Bar # 938936
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C.  20009-7124
(202) 745-1942

_____
Alan R. Kabat, Esq., D.C. Bar # 464258
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C.  20009-7124
(202) 745-1942

*Attorneys for Plaintiff Nicholas Spaeth*

DATED:  July 28, 2011