# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NICHAEL SPAETH,** | |
| *Plaintiff*, | |
| v. | **Civil Action No. 11-1376 (ESH)** |
| **GEORGETOWN UNIVERSITY,** | |
| *Defendant*. | |

## MEMORANDUM OPINION

Plaintiff Nicholas Spaeth brings suit against Georgetown University, alleging that it discriminated based on age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.* ("DCHRA"), when it declined to interview and hire him after he applied for an entry-level tenure-track teaching position through the 2010 American Association of Law Schools ("AALS") Faculty Appointments Register.  (*See* Amended Complaint, Nov. 7, 2011 [ECF No. 10] ("Am. Compl.").)[1]  Georgetown now moves for summary judgment.  For the reasons set forth below, Georgetown's motion will be granted.

---

[1] Spaeth originally sued five other law schools along with Georgetown: Michigan State University College of Law; the University of Missouri School of Law; the University of California, Hastings College of the Law; the University of Iowa College of Law; and the University of Maryland School of Law.  (*See* Am. Compl. ¶ 1).  In prior Orders, this Court severed Spaeth's claims against those five institutions and transferred them to the defendants' home forums.  (*See* Order, Feb. 17, 2012 [ECF No. 59]; Order, Mar. 8, 2012 [ECF No. 68].)  Spaeth voluntarily dismissed the claims against four of those schools, opting to proceed only against the University of Missouri in a state court action and against Georgetown in the instant suit.  (*See* Defendant's Motion for Summary Judgment [ECF No. 91] ("Def. Mot.") at 15 (citing Deposition of Nicholas Spaeth at 54-56).)

## BACKGROUND

### I.   SPAETH'S EDUCATIONAL AND PROFESSIONAL EXPERIENCE

Nicholas Spaeth is an attorney who was born in 1950 and currently lives in Kansas City, Missouri.  (*See id*. ¶¶ 1, 6.)  Spaeth achieved significant academic honors, graduating *magna cum laude* from Stanford University in 1972; receiving a Rhodes Scholarship to attend Oxford University, from which he graduated *summa cum laude* in 1974; and graduating from Stanford Law School in 1977, after serving as Managing Editor of the Stanford Law Review.  (*See id*. ¶¶ 38-40.)  Following law school, he served as a law clerk to Judge Myron Bright on the Eighth Circuit Court of Appeals and to Justice Byron White on the United States Supreme Court.  (*See id*. ¶¶ 41-42.)  Spaeth subsequently had an illustrious career in the practice of law, serving as North Dakota State Attorney General for seven years, as general counsel to several Fortune 500 companies, and as a lawyer in private practice.  (*See id*. ¶¶ 44-45, 48-59.)  Spaeth also taught constitutional law as an adjunct professor of law at the University of Minnesota Law School from 1980 through 1983.  (*See id*. ¶ 61.)

After retiring in 2009 from his most recent position as a senior executive officer at the Federal Home Loan Bank of Des Moines, Spaeth decided to pursue an academic career.  (*See Declaration of Nicholas Spaeth ("Spaeth Decl."), Ex. 8 to Plaintiff's Opposition to Defendant's Summary Judgment Motion [ECF No. 95] ("Pl. Opp."), ¶ 9; Defendant's Statement of Undisputed Facts [ECF No. 91-2] ("Def. SOF") ¶ 3; Plaintiff's Response to Defendant's Statement of Undisputed Facts [ECF No. 95-3] ("Pl. Resp. SOF") ¶ 3.)  He made inquiries at several schools, hoping to obtain a permanent position.  (*See* Exs. 8-17 to Defendant's Praecipe ("Def. Praecipe") [ECF No. 103].)  Ultimately, he obtained a non-tenure-track position as

Visiting Professor of Law at the University of Missouri at Columbia for the 2010-2011 school year, teaching securities law, mergers and acquisitions, banking law, and accounting and business transactions.  (*See* Spaeth Decl. ¶ 9.)

## II.  SPAETH'S APPLICATION FOR EMPLOYMENT

Because the visiting professor position at the University of Missouri was only a one-year appointment, Spaeth continued his search for a permanent position through the AALS entry-level hiring process in the fall of 2010.  (*See* Def. SOF ¶ 5; Pl. Resp. SOF ¶ 5.)  AALS facilitates entry-level hiring for its 172 member schools, including Georgetown University Law Center ("Georgetown").  (*See* Def. SOF ¶ 6; Pl. Resp. SOF ¶ 6.)  AALS maintains an online system, the Faculty Appointments Register ("FAR"), through which candidates may submit information regarding their qualifications and interest in academic positions.  (*See* Def. SOF ¶ 7; Pl. Resp. SOF ¶ 7.)  Candidates fill out a one-page electronic FAR form, which requests information about the candidate's education, work experience, teaching interests, and "Major Published Writings." (*See* Def. SOF ¶ 7; Pl. Resp. SOF ¶ 7.)  Candidates may also attach their resumes to the FAR form.  (*See* Pl. Resp. SOF ¶ 13.)  AALS enters all FAR forms into a centralized database that member law schools can search to identify candidates of interest.  (*See* Def. SOF ¶ 7; Pl. Resp. SOF ¶ 7.)  In addition, each fall AALS sponsors a Faculty Recruitment Conference in Washington, D.C., where member law schools can conduct brief screening interviews of candidates in order to decide which applicants to invite to campus for more in-depth interviews. (*See* Def. SOF ¶ 8; Pl. Resp. SOF ¶ 8.)

Spaeth submitted a FAR form in the fall of 2010.  (*See* Def. SOF ¶ 13; Pl. Resp. SOF ¶ 13.)  Spaeth indicated, in response to prompts on the form, that the subjects he would "most like to teach" included financial institutions, insurance law, and business associations.  (Spaeth

FAR Form, Ex. A to Spaeth Decl.)  Under the heading "other subjects may be interested in teaching," he listed securities regulation, corporate finance, constitutional law, and Native American law.  (*Id.*)  Finally, he listed criminal law and international business transactions as "other subjects would be willing to teach, if asked."  (*Id.*)  Spaeth did not list tax as an area in which he was interested or willing to teach.  Spaeth characterized the omission of tax from his FAR form as a computer error, explaining "[t]here was an error in posting entries for the third teaching category ('Other subjects would be willing to teach, if asked'), since I tried to list tax and one other subject, but the online registration process only listed the second and fourth items that I posted."  (Spaeth Decl. ¶ 12.)  The only publication that Spaeth listed was a "Handbook of American Indian Law" published in 1993.  (Spaeth FAR Form.)  Spaeth noted on his FAR form that his "[f]ull resume [was] available online."  (*Id.*)  His resume indicated, among other things, that as Visiting Professor of Law at the University of Missouri, he was "[t]eaching in the areas of financial services regulation, securities and taxation."  (Spaeth Resume, Ex. A to Spaeth Decl., at 1.)  His resume did not include a publications section but under the heading "Other Background," it stated "Editor, *American Indian Law Deskbook* . . . and author of numerous other publications."  (*Id*. at 4.)

In September and October of 2010, Spaeth wrote to several law schools directly to indicate his interest in being considered for a position, including the University of Kansas, Arizona State University, the University of Oregon, the University of Minnesota, the University of Colorado, the University of Wyoming, and the University of Missouri.  (*See* Deposition of Nicholas Spaeth ("Spaeth Dep.") at 47-48, Ex. 2 to Declaration of Douglas Crosno [ECF No. 91-4] ("Crosno Decl."); Exs. 1, 2, 4 & 5 to Def. Praecipe.)  He did not write directly to Georgetown

or otherwise have any other contact with the school, except to submit his FAR form to AALS for review by Georgetown and 171 other schools.  (*See* Def. SOF ¶ 24; Pl. Resp. SOF ¶ 24.)

Spaeth was only invited to preliminary interviews by two schools in 2010 – the University of Missouri and the University of Nebraska – and received no job offers.  (*See* Def. SOF ¶ 66; Pl. Resp. SOF ¶ 66.)  His contract with Missouri was not renewed after the 2010-11 school year, and although he has pursued various opportunities in the public sector and in private practice, he has not been employed since that time.  (*See* Def. SOF ¶ 67; Pl. Resp. SOF ¶ 67.)

## III.    GEORGETOWN'S HIRING PROCESS

During the 2010-2011 hiring cycle, Georgetown formed separate committees for entry-level hiring and lateral hiring, as it had done since 2008.  (*See* Def. SOF ¶ 28, Pl. Resp. SOF ¶ 28; Ex. 4 to Cornelia Pillard Deposition [ECF No. 95-6] ("Pillard Dep.") at 4.)  The entry-level hiring committee was chaired by Professor Cornelia Pillard and included four other professors, including Rebecca Tushnet and Joshua Teitelbaum.  (*See* Aug. 21, 2010 Pillard email, Ex. 21 to Pillard Dep.)  When the first distribution of FAR forms became available in late August 2010, Pillard divided them alphabetically to give each committee member 130 applications to review in an "initial full sweep," indicating that she "want[ed] at least one of us to have looked at each applicant's FAR one-pager."  (*Id*.)  Pillard assigned herself the last 142 applications, which included Spaeth's.  (*Id*.)  The committee later reviewed a second distribution of 111 FAR forms, also divided roughly evenly amongst the committee members for an initial review.  (*See* Sept. 12, 2010 Pillard email, Ex. 22 to Pillard Dep.)  Certain applications were reviewed by multiple committee members in an effort to identify candidates in particular fields (mainly tax) and to winnow down the pool of first-round candidates.  (*See* Def. SOF ¶¶ 42, 43, 44; Plaintiff's

Concise Statement of Genuine Issues of Disputed Material Facts [ECF No. 95-4] ("Pl. SOF")

¶ 20.)

Out of approximately 800 FAR forms reviewed by the committee, twenty-five were selected for initial screening interviews conducted at the AALS Faculty Recruitment Conference in late October 2010, or, for local candidates, off-site around the same time period. (*See* Def. SOF ¶ 45.) Approximately ten candidates were invited for "call-back" interviews on campus and seven accepted the invitation. (*See* Transcript of April 8, 2013 Motions Hearing ("Tr.") at 10.) Ultimately, Georgetown offered entry-level tenure-track positions to four candidates, three of whom accepted. (*See id*.)

Georgetown's three hires during the 2010-11 cycle were John ("Jake") Brooks, Itai Grinberg, and Eloise Pasachoff. (*See* Def. SOF ¶ 52; Pl. Resp. SOF ¶ 52.) All three were thirty-five years old at the time they were hired. (*See* Def. SOF ¶ 55; Pl. Resp. SOF ¶ 55.) Brooks and Pasachoff both submitted FAR forms, and also wrote to Pillard directly expressing their interest in Georgetown and providing detailed research agendas and copies of publications prior to being selected for an interview. (*See* Def. SOF ¶ 59; Pl. Resp. SOF ¶ 59; Aug. 10, 2010 Letter from Brooks to Pillard, Ex. 3 to Pillard Decl.; Aug. 23, 2010 Letter from Pasachoff to Pillard, Ex. 5 to Pillard Decl.) Grinberg did not submit a FAR form, but instead, he wrote directly to Pillard after another Georgetown professor facilitated the connection. (*See* Oct. 6, 2010 email from Grinberg to Pillard, Ex. 4 to Pillard Decl.) Grinberg provided copies of his publications and a research agenda. (*See id*.) Unsolicited recommendation letters or emails were sent on behalf of each of the three candidates, primarily from law school professors. (*See* Exs. 6, 7, 8 to Pillard Decl.) Some of these recommendations were sent prior to the candidates being selected for interviews, while others were sent after they were selected but before the interviews took place.

6

All three hires had impressive credentials.  Grinberg graduated from Amherst College *magna cum laude* and from Yale Law School.  He spent several years as a tax associate at the law firm of Skadden Arps, one year as counsel to the President's Advisory Panel on Federal Tax Reform, and three years as an Attorney-Advisor in the Office of Tax Policy at the Treasury Department.  At the time he was hired, Grinberg had published four scholarly articles, had a "job talk" paper, and had a detailed research agenda, all related to tax.  (*See generally* Exs. 4 & 7 to Pillard Decl.)

Brooks graduated from Harvard College *cum laude* and Harvard Law School *magna cum laude*, where he earned a prize for the best student paper on taxation and worked as a research assistant to a top tax scholar.  After law school, Brooks clerked for Judge Norman H. Stahl of the First Circuit Court of Appeals before working at the law firm of Ropes & Gray as a tax associate for two years.  Brooks then served as a Climenko Fellow and Lecturer on Law at Harvard Law School for two years.  At the time he was hired, Brooks had one scholarly article accepted for publication by the Columbia Journal of Tax Law and a work in progress, both related to tax. (*See generally* Exs. 3 & 6 to Pillard Decl.)

Pasachoff graduated from Harvard College *summa cum laude*, winning a prize in her junior and senior years for the highest grades in the humanities.  She received a master's degree in English from Yale University; a JD from Harvard Law School, graduating *magna cum laude*; and an MPA from Harvard's Kennedy School of Government.  She clerked for Judge Jed S. Rakoff of the Southern District of New York, Judge Robert A. Katzmann of the Second Circuit Court of Appeals, and Justice Sonia Sotomayor of the Supreme Court.  Like Brooks, she served as a Climenko Fellow and Lecturer on Law at Harvard Law School for two years.  At the time she was hired, she had published two scholarly articles and a policy paper for the Brookings

Institution, as well as having a "job talk" paper that had been accepted for publication.  (*See generally* Exs. 5 & 8 to Pillard Decl.)

## ANALYSIS

## I.    GOVERNING LAW

### A.    SUMMARY JUDGMENT

"Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 335 (D.C. Cir. 2011); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" and precludes summary judgment only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

When considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Still, when the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  It may not rely on "mere allegations or denials," but rather "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (internal quotation marks and citation omitted).  "[W]holly conclusory statements for which no supporting evidence is offered" will not suffice.  *Carter v. Greenspan*, 304 F. Supp. 2d 13, 21 (D.D.C. 2004) (citing *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C. Cir. 1999)).  A moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.     ADEA

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age," 29 U.S.C. § 623(a)(1), and includes persons forty years of age or older in the protected class.  *Id*. at § 631(a). The essential elements of a discrimination case under the ADEA are that "(i) the plaintiff [must have] suffered an adverse employment action (ii) because of the plaintiff's . . . age."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), to ADEA claims).  To succeed on an ADEA claim, a plaintiff must "prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employment action."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  *Id*.

"In a refusal-to-hire or refusal-to-promote discrimination case, the *McDonnell Douglas prima facie* factors are that (i) the employee belongs to a . . . protected class, (ii) the employee applied and was qualified for a job for which the employer was seeking applicants; (iii) despite the employee's qualifications, the employee was rejected; and (iv) after the rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Brady*, 520 F.3d at 493 n.1 (internal quotation marks and citation omitted).

Once an employee has shown that he has suffered an adverse employment action, the burden shifts to the employer to come forward with a "legitimate, non-discriminatory reason" for the challenged employment action. *Brady*, 520 F.3d at 493. If the employer then moves for summary judgment, the district court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 494. The Court considers "'(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Aka*, 156 F.3d at 1289). If the employee has not met his burden, the employer's motion for summary judgment is properly granted. *Brady*, 520 F. 3d at 497. However, "when the plaintiff offers direct evidence of discriminatory intent, that evidence will 'generally entitle a plaintiff to a jury trial.'" *Ayissi-Etoh v. Fannie Mae*, No. 11-7127, 2013 WL 1352239, at *3 (D.C. Cir. Apr. 5, 2013) (quoting *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)); *see also George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) ("a plaintiff can show discrimination either directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence" (internal quotation marks and citations omitted)). Direct evidence does not include "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse v. Hopkins*, 490

U.S. 228, 277 (1989) (O'Connor, J., concurring) (superseded in other respects by 1991 amendments to the Civil Rights Act).

### C.      D.C. Human Rights Act

The D.C. Human Rights Act ("DCHRA") makes it unlawful for an employer to "fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment" whether "wholly or partially for a discriminatory reason based upon . . . age."  D.C. Code § 2-1402.11.  The protected class under the DCHRA is anyone aged 18 years or older.  *Id.* § 2-1401.02.  D.C. courts have long interpreted the DCHRA congruently with the federal courts' interpretation of the ADEA.  *See Washington Conv. Ctr. v. Johnson*, 953 A.2d 1064, 1073 (D.C. 2008).  Accordingly, under the D.C. statute, "the plaintiff's age must have actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Id.* (quoting *Reeves*, 530 U.S. 133, 141 (2000)).  Although the Supreme Court has recently adopted a "but-for" causation standard in interpreting the ADEA, *see Gross*, 557 U.S. at 180, the inquiry under the DCHRA remains whether age had "a determinative influence."  *See Cain v. Reinoso*, 43 A.3d 302, 306 (D.C. 2012).

## II.     GEORGETOWN HAD A NONDISCRIMINATORY REASON FOR NOT INTERVIEWING OR HIRING SPAETH

Spaeth alleges that Georgetown did not interview or hire him because of discrimination based on age, while hiring three candidates approximately twenty-five years younger than Spaeth, and, he asserts, less qualified.  (*See* Compl. ¶ 166.)  Georgetown denies that discriminatory animus played any role in its decision and argues that Spaeth's application was rejected because "the materials he submitted did not reveal any interest or experience in producing the kind of original legal research and scholarship that Georgetown – like other top-

tier law schools in the United States – requires." (Def. Mot. at 3.)  Thus, despite his impressive credentials, he did not meet "one important (and non-discriminatory) qualification Georgetown requires of its entry-level tenure-track hires."  (*Id*. at 17.)  Spaeth claims that this explanation is pretextual, arguing, *inter alia*, that he has "presented extensive evidence of ageist remarks that is both relevant and compelling circumstantial evidence that age bias improperly permeated Georgetown's hiring process."  (Pl. Opp. at 38.)  At the motions hearing, Spaeth also argued for the first time that that these "ageist remarks" in fact constitute direct evidence of discriminatory animus.  (Tr. at 53-54.)  For the reasons set forth, the Court concludes, based on the undisputed evidence, that a reasonable jury could not find that Georgetown's stated reasons for not interviewing or hiring Spaeth were pretextual and that Georgetown intentionally discriminated against him based on age.

### A.      Scholarship Was A Primary Job Qualification

Spaeth attacks Georgetown's argument that he was not interviewed or hired because he did not meet a primary qualification that it required of tenure-track entry-level candidates as pretextual, maintaining that "[t]he record evidence shows that scholarship was *not* the paramount criterion for evaluating entry level candidates."  (Pl. Opp. at 33.)  He argues that Georgetown had no "written requirements that scholarship weighed heavily, or outweighed teaching and service."  (*Id*.)  He refers to Pillard's deposition testimony that "the standards of tenure are significant because . . . we are hiring people we want to tenure," and highlights that Georgetown's tenure standards, which were last published in 1994, state, among other things, that "education of students . . . is the 'primary mission' of the law school."  (Pl. Opp. at 34 (quoting Georgetown University Law Center, "Memorandum of Standards and Procedures for Tenure and Promotion" ("Tenure Standards"), Ex. 5 to Pl. Resp. SOF, at 4).)  He also suggests that Pillard's August 21,

2010 memo to the hiring committee listed "subjective [hiring] criteria, which did *not* specify that scholarship was paramount."  (Pl. Opp. at 33 (original emphasis).)  He describes certain other comments by current faculty as reflecting the use of subjective criteria for evaluating candidates.  (*See id*. at 34.)  And, he argues that certain current faculty members strongly criticized the scholarship of the three hires and he extrapolates that if those candidates were hired despite these criticisms, scholarship must not be the "paramount" criterion.  (*Id*. at 36.)

None of Spaeth's arguments demonstrates that Georgetown's stated emphasis on scholarship is pretextual.  On the contrary, the record is clear that scholarship was a primary concern in Georgetown's hiring process.  The vast majority of exchanges among faculty members about the candidates who were called back reflect extensive discussions about the quality of their scholarly work.  The fact that the faculty focused their debate on the merits of various candidates' scholarship only underscores its centrality as a qualification for the faculty.  Whether scholarship was *more* highly valued than teaching is beside the point, for it is evident that it was an essential job qualification.  Furthermore, Spaeth misconstrues many of the comments by Georgetown faculty, especially Pillard's memo to her colleagues, in which her comments actually emphasize the significance of scholarship.[2]  Finally, the lack of a written requirement prioritizing scholarship in hiring is irrelevant, because there is no need to put in writing what everyone knows: scholarship is, for better or worse, one of the overriding concerns among elite law schools in making hiring decisions.  Furthermore, the tenure standards from which Spaeth selectively quotes to highlight the importance of teaching emphasize as much, if

---

[2] Pillard wrote, "What are we looking for?  You know as well as I do.  Something like: interesting, congenial, academically excellent candidates, *likely to be talented and productive faculty colleagues, whose background and experience make us think they will have something to say to us and the wider world,* and to our students."  (Pl. Resp. to SOF ¶ 27 (quoting Aug. 21, 2010 memo from Pillard to Hiring Committee, Ex. 21 to Pillard Dep., at 2) (emphasis added).)

not more, the centrality of scholarship to tenure and promotion decisions.  (*See* Tenure

Standards, at 7-9.)

Admittedly, Spaeth, and perhaps others, do not agree with the criteria that law schools

use for hiring faculty.  Spaeth thinks law students should be taught by practitioners and not by

academics.  He cannot, however, dispute that scholarship is indeed a primary focus of law school

faculty hiring.  He said as much in an opinion piece in the *National Law Journal* in 2011, where

he wrote:

> Although law schools still need to teach fundamentals like constitutional law
> where scholarly inclined 30-year-olds fresh out of a clerkship can focus their
> lives, an increasingly imperative need is for skilled and experienced practitioners
> teaching transaction-based classes.  It is difficult to convincingly argue that a
> teacher who has spent his or her entire career in academe is more qualified to train
> transactional lawyers than those who have years of experience negotiating,
> documenting and closing actual business deals.

(Nicholas J. Spaeth, *At law schools, age bias co-exists with outdated practices*, NATIONAL LAW

JOURNAL, Aug. 24, 2011, Ex. 20 to Spaeth Dep.)  The thrust of this passage, and indeed of the

piece as a whole, is Spaeth's belief that law schools are wrong to value scholarship over practical

experience and that this emphasis should be changed.  As reflected in Spaeth's article, there is no

real dispute that scholarship *is* one of the primary criteria that Georgetown uses in its entry-level

hiring, and it is not for the Court to denigrate this choice by the law school.  *See Jackson v.

Gonzales*, 496 F.3d 703, 708-709 (D.C. Cir. 2007) ("[C]ourts must not second-guess an

employer's initial choice of appropriate qualifications; rather the courts defer to the [employer's]

decision of what nondiscriminatory qualities it will seek in filling a position.") (internal

quotation marks and citations omitted).

Spaeth also argues that because Pillard recalls reviewing Spaeth's application but does

not recall anything about her review, "this Court must find that there is no evidence showing that

14

Professor Pillard made any assessment of Mr. Spaeth's scholarship or scholarly potential."  (Pl. Opp. at 34.)  However, a decisionmaker's understandable lack of memory about a particular employment decision does not render it pretextual or discriminatory.  *See, e.g., Pulczinski v. Trinity Structural Towers, Inc*., 691 F.3d 996, 1004 (8th Cir. 2012) ("That [the company president] does not specifically remember terminating [plaintiff] does not mean that [the employer] failed to articulate a legitimate, nondiscriminatory justification."); *E.E.O.C. v. Cintas Corp*., Nos. 04-40132, 06-12311, 2010 WL 3547965, at *9 (E.D. Mich. Sept. 3, 2010) (accepting employer's rationale for why it would not have hired an applicant when no managerial employee specifically remembers interviewing the candidate).  Since it cannot be disputed that scholarship and scholarly potential were among the primary criteria that the committee applied to the three hires and that Pillard applied during her perusal of more than 150 applications, Spaeth has *no* basis for claiming that reference to this criteria was pretextual.

**B.      Spaeth Was Not "Significantly Better Qualified"**

In order to succeed on his claim, Spaeth concedes that he must demonstrate that he should have not only been interviewed but also been hired instead of the three who were ultimately hired.  (*See* Tr. at 53.)  In order to prevail on such a "relative qualifications claim," Spaeth "must show that []he is *significantly* better qualified for the job than [the applicants] ultimately chosen."  *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 25 (D.C. Cir. 2013) (original emphasis) (internal quotation marks and citations omitted).[3]

---

[3] It is useful to review the reasoning behind the "significantly better qualified" standard: "[w]hen an employer says it made a hiring decision based on the relative qualifications of the candidates, 'we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone.  On the other hand, if a factfinder can conclude that a 'reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously

Faced with this exacting standard, Spaeth attempts to redefine what the job qualifications are by elevating practical experience into a job qualification despite the undisputed evidence that Georgetown does not emphasize extensive practical experience in its hiring of entry-level tenure track professors.  Georgetown is looking for a record and promise of scholarly publications, which Spaeth simply did not have.  Thus, he was not significantly more qualified than the three hires.  Rather, in Georgetown's eyes, he was less qualified.[4]  As Georgetown acknowledges, Spaeth's credentials were impressive and he had an elite pedigree, but his credentials did not include scholarship, which was a necessity for being eligible for hire.  (*See* Def. Mot. at 3-4.)

As noted by Pillard in her declaration, "Mr. Spaeth's FAR form identified his interests as financial institutions, insurance law and business associations and related topics, but the only publication on his FAR form [was] a 'Handbook of American Indian Law' published in 1993, which did not appear to relate to the subject areas for which he purportedly sought an academic position."  (Pillard Decl. ¶ 25.)  His oblique reference to "numerous other publications" on his resume is hardly an effective marketing technique for an academic job (and even at this late date, he has not provided evidence that he actually has authored a single article published in a scholarly journal).  More importantly, the only publication that Georgetown knew about at the time of Pillard's review was his work as an editor, *not* as an author, of the Handbook of American Indian Law, which is not the type of scholarly work that was of interest to

---

selected a less-qualified candidate – something employers do not usually do, unless some other strong consideration, such as discrimination, enters the picture."  *Jackson*, 496 F.3d at 707.

[4] At the motions hearing, Spaeth's counsel argued that the three candidates' practical experience pales in comparison to Spaeth's experience of private practice in tax.  (*See* Tr. 88.)  And she argued, based on that criteria, that he was "higher qualified" as compared to someone who had "two-and-a-half years" as an associate in a law firm.  (*Id.*)  But again, there is no support for the argument that Georgetown considered years in private practice to be a significant benefit to a candidate's application.

Georgetown.  *See, e.g., Edwards v. Joe Culliher Chrysler-Plymouth, Inc.*, No. 86-89-CIV-4-H, 1990 WL 484147, at *2 (E.D.N.C. Sept. 28, 1990), *aff'd*, 932 F.2d 963 (4th Cir. 1991) ("Assuming the plaintiff's characterization of his [work] experience is correct, it is irrelevant because he did not provide this information to the defendants when the hiring decisions were made."); *Hoff v. County of Erie*, No. CIV-76-477E, 1981 WL 308, at *8 (W.D.N.Y. June 18, 1981) (dismissing discrimination claim where plaintiff "did not show to the employer at the time she applied that she was qualified").

By contrast, the three successful candidates all had publications of the kind that matters in legal academia – "original, scholarly work" that had been or was to be published in scholarly journals.  (Pillard Decl. ¶ 25.)  Brooks had one article accepted for publication by the Columbia Journal of Tax Law, a second underway, and a detailed research agenda.  (*See* Exs. 3 & 6 to Pillard Decl.)  Thus, Spaeth's argument that Brooks had "zero publications" is just wrong.  (Tr. at 56.)  Plus, his specialty was tax, which was of great interest to Georgetown.  (*See* Exs. 3 & 6 to Pillard Decl.)  Pasachoff had two scholarly publications and a third accepted for publication, as well as a detailed research agenda.  (*See* Exs. 5 & 8 to Pillard Decl.)  Grinberg already had five scholarly publications in the tax field at the time, as well as a detailed research agenda, and he too was interested in teaching tax.  (*See* Exs. 4 & 7 to Pillard Decl.)

There is no need for the Court to conduct a more detailed inquiry into the comparators' qualifications, for "[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."  *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.C. 1996) (internal quotation marks and citation omitted).  This admonition is particularly apt when faced with discrimination claims in the context of university

tenure decisions.  *See, e.g., Tanik v. S. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997);

*Kumar v. Bd. of Trustees, Univ. of Mass.*, 774 F.2d 1, 10 (1st Cir. 1985); *Zahorik v. Cornell*

*Univ.*, 729 F.2d 85, 92-94 (2d Cir. 1984).  The Supreme Court has cautioned,

> If a federal court is not the appropriate forum in which to review the multitude of
> personnel decisions that are made daily by public agencies, far less is it suited to
> evaluate the substance of the multitude of academic decisions that are made daily
> by faculty members of public educational institutions – decisions that require "an
> expert evaluation of cumulative information and [are] not readily adapted to the
> procedural tools of judicial or administrative decisionmaking."

*Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) (internal quotation marks and

citations omitted) (also noting in this context a "responsibility to safeguard [educational

institutions'] academic freedom, a special concern of the First Amendment" (internal quotation

marks and citations omitted).)  These same concerns apply to claims for failure to hire for a

tenure-track position.  Notably, "the number of factors considered in tenure decisions is quite

extensive" and "tenure decisions are a source of unusually great disagreement."  *Zahorik*, 729

F.2d at 92-93.  Moreover, "[w]here the tenure file contains the conflicting views of specialized

scholars, triers of fact cannot hope to master the academic fields sufficiently to review the merits

of such reviews and resolve the differences of scholarly opinion."  *Id*. at 93.  Georgetown has

articulated the reasons it considered Pasachoff, Brooks, and Grinberg to be more qualified than

Spaeth, and, in the realm of scholarship and demonstrated scholarly potential, they were.

Therefore, Spaeth cannot show, according to the legally legitimate criteria that Georgetown used,

that he was "significantly better" (or even "more") qualified than the three hires.

## C.    Georgetown Focused on Hiring Tax Candidates

It is also undisputed that Georgetown recognized that it had a need to hire tax scholars.

The record is replete with discussions about looking for tax candidates, and two out of the three

candidates who were ultimately hired were hired to teach tax.  (*See* Def. SOF ¶ 53.)  Georgetown

18

submits that Spaeth cannot now claim that he was a viable tax candidate who was rejected only based on his age, because he did not even indicate that he was interested in teaching tax or that he had any tax-related publications on his FAR form.  (*See* Defendant's Reply in Support of its Motion for Summary Judgment ("Def. Reply") at 12.)  While Spaeth dispenses with this argument as being "false" (*see* Pl. Opp. at 35), he simply cannot escape the undisputed fact that tax was not listed on his FAR form.  Rather, he insists that because his resume stated that he would be teaching at the University of Missouri School of Law "in the areas of financial services regulation, securities and taxation," and because it showed that he had served as general counsel at "two Fortune 500 companies directly involved in tax issues," Georgetown should somehow have known that he could and would teach tax.  (*Id*.)  Spaeth's position is untenable.  In response to three separate prompts on the FAR form, Spaeth did not list tax as something he would be interested in or willing to teach, nor did he list any scholarly publications relating to tax on his FAR form or his resume.  (*See* Spaeth FAR Form & Spaeth Resume, Ex. A to Spaeth Decl.) Georgetown was not required to divine such an interest when Spaeth did not even bother to mention it as a topic of teaching interest, and its failure to do so can hardly be used as evidence of discrimination.

Spaeth also argues that this "'criterion' could not have been that important, because neither of the tax hires had any experience in teaching tax."  (*See* Pl. Opp. at 35.)  This is oversimplification.  Just as Georgetown was first and foremost interested in scholars, it was first and foremost interested in tax scholars who were also interested in and willing to teach tax.[5]

---

[5] Professor Adam Levitin explained, "[W]e have a very large tax LLM program that is critical to the school's finances and it's very hard . . . to find people who are really writing scholarship in the tax area, and . . . the scholarship is very important because that's what ultimately sort of signals the prestige of the program."  (Levitin Dep. at 31-32.)  He noted further, "[T]ax is just kind of a standing need . . . there is not a sufficient supply of tax candidates who both can

Both Brooks and Grinberg had published articles on tax topics and submitted detailed research agendas entirely focused on tax scholarship.  (*See generally* Exs. 3, 4, 6 & 7 to Pillard Decl.) There is no evidence that Spaeth had published a single scholarly article related to tax, but more significantly, Georgetown had no reason to think, based on the only information available to it on the FAR form, that he had any interest in teaching tax or that he had any publications or a research agenda with a tax focus.  While Spaeth had some experience teaching tax and had work experience in that field, this does not translate into a scholarly interest in tax, or even an interest in teaching tax, given Spaeth's glaring omission of any mention of tax when asked about his teaching interests.

### D.      Spaeth's Application was Perfunctory

As argued by Georgetown, Spaeth, in stark contrast to the three successful candidates, did nothing to distinguish himself from the 800 applicants who submitted FAR forms and resumes through AALS.  (*See* Def. Mot. at 5.)  Significantly, he did nothing to indicate an interest in Georgetown, except to upload his FAR form and his resume into the AALS system, where it was available for download by all 172 member law schools, including Georgetown.  (*See id*.)  As explained by Pillard, who served as the chair of the entry-level committee, "the most competitive candidates typically prepare detailed 'research agendas,'" provide "copies of (or hyperlinks to) scholarly articles they have already authored or are in the process of writing," and commonly "contact law schools directly in advance of (or outside of) the AALS interview process to express their specific interest in a particular school."  (*See* Pillard Decl. ¶ 9.)  Because the FAR system does not allow applicants to direct their applications to a particular school, "direct

---

understand the plumbing, as it were, the actual details of tax law, and can connect it with either theory or policy. . . [I]t's easy enough to find people who . . . can say something and make a policy move, but to find someone who can connect them in scholarship is actually very difficult."  (*Id*. at 180-181.)  (*See also* Pillard Dep. at 58 (Georgetown Dean told Pillard to look for "the strongest tax *scholars* you can identify" (emphasis added).)

appeals to a law school can be a useful way for a candidate to make his or her application stand

out and be noticed."  (*See id*. ¶ 10.)

 Spaeth himself followed this common practice when he provided a brief research agenda

to the University of Missouri on September 26, 2010, a month before the Faculty Recruitment

Conference (*see* Ex. 6 to Def. Praecipe), and he also wrote letters directly to seven law schools in

the Midwest and the West to express his interest.  (*See* Spaeth Dep. at 47-48; *see also id*. at 47

(Spaeth acknowledging that he was aware that a candidate could write directly to a law school).)[6]

Notably, when asked during his deposition why he did not write directly to Georgetown, Spaeth

replied forthrightly, "Because at that point in time, I didn't really think that I wanted to live in

Washington."  (Spaeth Dep. at 48-49.)

 By contrast, the record shows conclusively that the three candidates who were hired, and

one other candidate who was seriously considered, all sent letters directly to Georgetown

expressing their interest in teaching there and enclosing their resumes and lengthy three- to five-

page, single-spaced research agendas.  (*See* Exs. 3, 4, & 8 to Pillard Decl; Ex. 13 to Pillard Dep.)

---

[6] To excuse his lack of effort, plaintiff's counsel represented that when Spaeth wrote directly to several law schools "the responses he got back [were] that we can't do it this way, go through AALS."  (Tr. at 76.)  However, this assertion is flatly contradicted by Spaeth's conduct, as well as by the correspondence that has been filed as exhibits in this case, all of which reflects acceptance of his direct application in both 2009 and 2010 (*See, e.g.*, Oct. 20, 2010 email from Stacy Leeds, University of Kansas School of Law, to Spaeth, Ex. 1 to Def. Praecipe ("Thanks for contacting me and I apologize for the delay.  I'll forward this to our full committee for review."); Oct. 19, 2010 email from Nancy Gregory, Arizona State University College of Law to Spaeth, Ex. 2 to Def. Praecipe ("Thank you for your application for a faculty position here at the College of Law.  I have received your emailed material and will pass it along for review by the Chair and the Appointments Committee."); Oct. 22, 2010 email from Debra Thurman, University of Oregon School of Law to Spaeth, Ex. 4 to Def. Praecipe ("Thank you for your letter expressing interest in a faculty position at the University of Oregon School of Law.  We are delighted that you are interested in exploring opportunities with us, and we look forward to considering your application."); May 17, 2009 email from Eric Janus, University of Minnesota School of Law, to Spaeth, Ex. 10 to Def. Praecipe ("Thanks very much for your email note and resume . . . At this point, our future hiring is quite uncertain.  I'll keep your materials on file, and urge you to keep in touch, particularly in the fall, as we get more clear on our plans.").

The three who were hired also had academic contacts send unsolicited recommendations directly to Georgetown.  (*See* Exs. 3, 4, & 8 to Pillard Decl.)

In the face of this evidence, Spaeth asserts, without support, that Pillard's affidavit is "false."  (*See* Pl. Opp. at 35.)  He baldly states that "[t]he resumes, research agendas, and writing sample(s) that Georgetown produced in discovery were those that the 25 interviewees provided *after* Georgetown notified them that they had been selected for an interview, and requested that they provide an updated resume, along with a research agenda and writing sample(s)."  (Pl. Resp. to SOF ¶ 19 (emphasis in the original).)  Spaeth provides no record citation for that assertion, and it is plainly incorrect with respect to the four applications (the three hires plus one additional candidate) that have been filed with the Court.  (*See* Exs. 3, 4, & 8 to Pillard Decl; Ex. 13 to Pillard Dep.)  While the record does not reflect how many of the 800 applicants or the twenty-five interviewees actually submitted these types of materials prior to the first-round interviews, Spaeth wants to hold Georgetown responsible for this omission.  He suggests that but for Georgetown's "destruction" of the full applications for all the individuals who applied through AALS, with the exception of the twenty-five interviewees, he would be able to show that his 800 comparators did no more than he did.  (*See* Pl. Opp. at 35-36.)

This argument is without merit.  First, the FAR forms were the property of AALS, so Georgetown had no obligation to retain them, and even though Spaeth issued a document subpoena to AALS, he did not seek their production.   (*See* Def. Reply at 11 n.4.)  Second, Georgetown did produce the resumes for the twenty-five candidates who were selected for an interview (*see* Plaintiff's Sur-reply Brief ("Pl. Sur-reply") at 6), but the Court has no information about what, if any, additional materials were sent by these candidates before the interviews.  Thus, since Spaeth has the burden to show pretext, the absence of more extensive documentation

does not undercut Georgetown's position that applicants commonly contacted Georgetown prior to the selection of interviewees.

Spaeth asserts that neither AALS nor Georgetown notified applicants that they were required to submit a research agenda, nor was it a requirement, and that "the practice is that the detailed research agenda and writing sample(s) are not provided until after a candidate is selected for an initial interview." (*See* Pl. Opp. at 35.)  As noted, Spaeth provides no evidence to support this assertion as to the practice, and it is contradicted by the only relevant evidence in the record: Pillard's declaration and the four applications, including those of the three hires, that Georgetown received before selecting the interviewees.

In essence, Spaeth objects to this informal system, arguing that "this creates a subjective hiring system which discriminates against older candidates who were not recently in a fellowship program and are not recent mentees of law school professors, thereby favoring younger, recent law school graduates." (Pl. Resp. SOF ¶ 59.)  But there is no "this" there.  What Georgetown describes is the common sense proposition that a job candidate in a highly competitive market has to make a serious effort to come to an employer's attention and to distinguish himself from the pack by sending impressive, relevant materials, rather than a barebones application, and by having mutual and well-respected acquaintances, professors, judges, or employers advocate on his behalf by contacting the law school directly.  This reality does not mean that employers are discriminating.  *See, e.g., Jackson v. Winter*, 497 F. Supp. 2d 759, 769 (E.D. Va. 2007) (comparing plaintiff's poorly written resume to successful applicant's well-written and detailed resume).  Furthermore, there is no legal or factual basis for Spaeth's claim that the system relies on subjective, legally impermissible criteria.  *See Grosdidier*, 709 F.3d at 26 ("the evidence of an allegedly 'arbitrary' selection process is not probative of pretext"); *Fischbach*, 86 F.3d at 1183

(without finding evidence of pretext, "the court must respect the employer's unfettered discretion to choose among qualified candidates"); *Chappell-Johnson v. Bair*, 358 F. App'x 200, 201 (D.C. Cir. 2009) ("there is no bar to considering subjective factors").

Furthermore, employment decisions based on factors that correlate with age do not necessarily prove age discrimination. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'") The fact that more young people are likely to go through a fellowship program, and as a result, have credentials and connections that give them a step up in the academic job market, does not equate with intentional age discrimination.

During the motions hearing before this Court, Spaeth's counsel also argued that because Georgetown hired candidates who did not apply only through AALS, it is pretext for the school to claim that they are following the AALS process. (*See* Tr. at 82.) But Spaeth has it backwards. Georgetown has not defended against Spaeth's discrimination claim by arguing that it followed the AALS process exclusively; on the contrary, it has argued that Spaeth's application package did not stand out from the hundreds of other applications that it received primarily, but not solely, through AALS. (*See* Def. Mot. at 17-18.) The fact that Georgetown interviewed and hired individuals who applied outside of the AALS process, or who submitted other materials in addition to their FAR form and resume, is not evidence of pretext or discrimination.

Many hiring processes, including the process for hiring law clerks, may not be ideal, but for any highly competitive job, it is common for applicants to make an effort to distinguish themselves from those who apply only via the computerized application system. Whether the use of direct or indirect contacts unfairly favors some does not mean that an employer's use of

information above and beyond the FAR form and a resume can be equated with age

discrimination.  Spaeth makes an assumption that he was obviously qualified for an interview,

and argues he would have provided additional (although undefined) information once he had

been selected for an interview.  Not only is his assumption unfounded, but his own conduct

belies the notion that an applicant could or should limit himself to the AALS process when

applying to elite schools.

In sum, no reasonable jury could conclude, based on the undisputed evidence, that age

was the "but-for" cause of – or even that age had a "determinative influence" on – Georgetown's

decision not to interview or hire Spaeth.  Simply put, Spaeth has not demonstrated the necessary

qualifications for an entry-level tenure-track position at the school.  He had no record of

scholarly work and did not demonstrate potential for producing such work in the future.  He did

not express an interest in tax, so he would not have been considered a candidate in the area that

Georgetown particularly wanted to fill.  He was not significantly more qualified than his

comparators; in fact, he was less qualified than them based on Georgetown's legitimate emphasis

on scholarship.  And, he expressed no real interest in Georgetown by contacting the school

directly, nor did he show any real commitment to scholarly research by providing a research

agenda to the school.  Curiously, he did both with respect to a limited number of schools in the

West and Midwest, because, after all, he didn't really "want[] to live in Washington."  (Spaeth

Dep. at 48-49.)  Given this record, there is no need for the Court to consider other evidence since

any such evidence is not relevant to the decision not to interview or hire him.  Thus, as far as the

"one central question" under *Brady*, 520 F.3d at 494 – "Has the employee produced sufficient

evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was

not the actual reason and that the employer intentionally discriminated against the employee on the basis of" age – the Court has no difficulty answering that Spaeth has not.

###  E.    Other Evidence

Spaeth's submission of what he refers to as other evidence of Georgetown's "pervasive bias against older entry level applicants" (*see* Pl. Opp. at 37) – statistical evidence; the involvement of Adam Levitin, who Spaeth argues was motivated by age bias; and allegedly ageist remarks by various members of the Georgetown faculty – is unavailing, for none of this evidence can overcome the fact that he was not a competitive candidate for the job.  But even if the Court needed to consider this evidence, it simply does not suggest that pervasive bias existed in the hiring process for entry-level tenure-track law professors at Georgetown.

###   1.    *Statistical Evidence*

Spaeth argues that "[t]he structure of the faculty hiring at Georgetown directly facilitated age discrimination, since the entire hiring process was geared towards interviewing and hiring young applicants."  (Pl. Opp. at 37.)  In support, he points to the fact that "all but one of the twenty-five entry level applicants interviewed in 2010 were under 40 (the exception was only 46)," and "all but one of the twenty-two entry level hires over the past decade were under 44 (the exception was only 44)."  (*Id.* at 38.)  These statistics are meaningless, however, without reference to the ages of the applicant pool.  Pillard testified that "people who want to be a [p]rofessor do often identify that relatively early in their career and so . . . we see a lot more entry level people in the[ir] 30s than in their 60s[.]"  (Pillard Dep. at 53.)  Without more specific information about the applicant pool, Spaeth's reference to the ages of the pool of interviewees and hires is irrelevant for proving discrimination.  *See, e.g., Henson v. Liggett Group, Inc.*, 61 F.3d 270, 276 (4th Cir. 1995) ("In the absence of demographic information about the pool of

employees at Liggett and the pool from which employees were hired or the positions into which they were hired, the figures offered by Henson are not proof of discrimination.")

It is revealing that when he addresses Georgetown's history with lateral hires, Spaeth focuses not on their age but on their practical experience, noting that "of the sixteen lateral hires over the past decade, only three had more than ten years' experience before joining academia." (*See* Pl. Opp. at 38.)  This statement suggests that Spaeth's real beef is with legal academia's disregard for practical experience, not age discrimination.  Moreover, as Georgetown points out, the median age of lateral hires over the past ten years is 52, which is well within the protected class of over-40 and not much younger than Spaeth was when he applied.  (Def. Reply at 14-15 (citing Declaration of Matthew Radler ("Radler Decl.") ¶ 8).)  Spaeth argues in his *National Law Journal* article that "[t]he root cause of this discrimination is the way new hiring is done. [Current faculty] understandably resent older practitioners who have not paid their dues in the same way they have and may also perceive them as a competitive threat to the entire tenure system."  (Ex. 20 to Spaeth Dep.)  This analysis, if anything, undercuts Spaeth's position, suggesting that the problem is less that "older practitioners" are older, and more that they are practitioners.

Georgetown's use of statistics is equally unavailing.  Georgetown submits that

> For entry-level positions, the statistical affidavit attached to the Opposition shows that none of the individuals hired by Georgetown in the past ten years was under 30 at the time.  In fact, the median age of all such individuals at [the] time they began their employment was 35 – not within the over-40 "protected class" under the ADEA but certainly not as young as Spaeth would make them out to be. Furthermore, within the past five years, Georgetown has hired two entry-level professors who were 40 or older at the time they began their employment, including one who was 46.

(Def. Reply at 14 (citing Radler Decl. ¶ 5).)  These statements are essentially irrelevant.  The number of hires under or over 30 years of age, or the fact that the median age of hires was 35, is

meaningless under the ADEA, which defines the protected class as being "over 40." 29 U.S.C.

§§ 621.  Nor is the fact that Georgetown has hired two candidates in their early to mid-40s of

much relevance, as they are still at least 15 to 20 years younger than Spaeth.  Age is different

from other classifications.  As articulated by the Supreme Court:

> [The ADEA] does not ban discrimination against employees because they are
> aged 40 or older; it bans discrimination against employees because of their age,
> but limits the protected class to those who are 40 or older . . . Because the ADEA
> prohibits discrimination on the basis of age and not class membership, the fact
> that a replacement is substantially younger than the plaintiff is a far more reliable
> indicator of age discrimination than is the fact that the plaintiff was replaced by
> someone outside the protected class.

*O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).  *See also Kralman v.*

*Ill. Dep't of Veterans' Affairs*, 23 F.3d 150, 155 (7th Cir. 1994) ("Indeed, it is considered

'hornbook law' that the ADEA action can be based on discrimination between older and younger

members of the protected class.")  Finally, without knowing anything about the applicant pool,

assertions about the number of individuals over 40 interviewed or hired provides no assistance to

the Court.

### 2.      Roles of Pillard and Levitin

Georgetown argues that Pillard was the sole decisionmaker with respect to Spaeth's

application for employment and that she had a legitimate, non-discriminatory reason for not

selecting him for an interview – namely, that "the materials he submitted did not show he could

meet" Georgetown's requirement that entry-level tenure-track hires have "the ability to produce

and interest in producing original legal scholarship."  (Def. Mot. at 17.)  In the first instance,

Spaeth contests that Pillard was the sole decisionmaker by arguing that "[t]he record evidence

shows that . . . at least two other members of the Entry Level Appointments Committee reviewed

her subset of the FAR forms and resumes in order to identify additional candidates in the fields

that Georgetown had particular hiring needs, *i.e.*, tax and business law." (Pl. Opp. at 33.)  It is uncontested that two other professors, Tushnet and Teitelbaum, "reviewed materials submitted by some candidates whose last names began with the letter 'S.'" (Def. Reply at 7.)  Also, it appears that their review was not limited to "target searches" of the FAR forms for tax candidates (*id.*), but was in fact broader.  (*See* Pl. Sur-reply at 3.)  Nonetheless, there is no evidence to suggest that either committee member specifically looked at Spaeth's form. Furthermore, there is no evidence that Tushnet or Teitelbaum harbored any discriminatory intent so any dispute on this issue is not material.  (*See* Def. Resp. SOF ¶ 20.)

Of more importance from Spaeth's point of view is his allegation that Professor Adam Levitin was involved in the hiring process and harbored discriminatory animus, as evidenced by several age-related, or, in Spaeth's view, "ageist" statements and by his presentation of age-related demographic data in 2011 about the Georgetown faculty.  (*See* Pl. Opp. at 39, 41.)  With respect to the 2010-11 cycle, Levitin was not on the entry-level hiring committee, but he was a member of the ad hoc tax committee, which was tasked with assisting in the recruitment of tax candidates.  (*See* Pl. Resp. SOF ¶ 28.  *But see* Levitin Dep. at 148 ("we did not understand our charge at all as being related to entry level").)  As evidence of Levitin's involvement in the decision-making process, Spaeth points to a September 29, 2010 email in which Pillard mentions having spoken with Levitin to get his "input" on specific tax candidates.  (*See* Sept. 29, 2010 email from Pillard to Hiring Committee, Ex. 9 to Pillard Dep.)  In addition, Spaeth suggests that a February 8, 2011 email from Levitin to Pillard addressing "entry-level hiring in general" indicates that Levitin played a role in evaluating non-tax candidates as well.  (*See* Pl. Resp. SOF ¶ 61 (citing Levitin Dep. at 135 & Feb. 8, 2011 email from Levitin to Pillard, Ex. 9 to Levitin Dep., at 1).)

This evidence does not support an inference that Levitin reviewed Spaeth's application. Levitin's involvement in the hiring process occurred *after* the initial screening of applications. The September 29, 2010 email reflects Pillard's solicitation of input from Levitin regarding only a select number of tax candidates whose applications had already been designated by members of the entry-level hiring committee for consideration, and the February 28, 2011 email reflects Levitin's impressions of the candidates who had already come for call-back interviews.  Since Spaeth's application never made it past the very initial culling stage, much less through a screening interview, he was not among the candidates referenced in either email. Therefore, Spaeth has not presented sufficient evidence to sustain the inference that anyone other than Pillard was responsible for the decision not to interview him.  However, even assuming *arguendo* that others somehow influenced Pillard's decisionmaking process, this does not change the fact that Spaeth did not meet Georgetown's threshold requirements.

Spaeth also argues that Levitin, as well as Levitin's mentor, former Georgetown Professor William Bratton, who led the hiring committee prior to Pillard, focused on hiring "promising young scholars" and that this equates with pervasive age bias.  As an example, Spaeth points to Levitin's presentation of two demographic analyses of Georgetown's faculty at two faculty meetings in the fall of 2011 as "confirm[ing] the pervasive bias against older applicants for entry level positions at Georgetown."  (Pl. Opp. at 24.)  He also attempts to link these analyses with Professor Bratton's undated memo, which Spaeth characterizes as focusing on hiring "young" faculty.  (*Id*.)  Spaeth's argument depends on mischaracterizations and leaps of logic that the Court is unwilling to entertain.

First, neither analysis is focused exclusively on the age demographics of the faculty.  Age is certainly highlighted, but so are gender; racial diversity; overall growth; comparative growth

in Legal Research and Writing positions versus academic positions; numbers of full-time faculty versus visiting faculty that teach 1L courses; numbers of new hires; entry-level versus lateral hiring; causes of faculty departures; and business law faculty age demographics and attrition. (*See generally* Adam Levitin, "GULC Faculty Demographics: Considerations in Hiring," Ex. 10 to Crosno Decl; Aug. 31, 2011 email from Levitin with attachment "Faculty Demographics," Ex. 16 to Levitin Dep.)  It is a gross oversimplification to suggest that the sole focus of these analyses was age demographics.  Second, as Georgetown accurately describes, "[t]he discussion of the age of the faculty was descriptive and accurate, and presented as aggregate data for forecasting purposes."  (Def. Resp. SOF ¶ 9.)  There is no evidence in the record that Levitin used this information to suggest that Georgetown should discriminate against older applicants in hiring, firing, or any other employment action.

Levitin circulated the demographic analyses during the 2011-12 academic year, when he took over as chair of the hiring committee, a year after the decision not to interview Spaeth.  That fact alone does not render the evidence irrelevant, if it painted a picture of a "discriminatory atmosphere [that] pervades the workplace and infects the company's personnel decisions." *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 347 (1st Cir. 1998).  *See also Parker v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 891 F.2d 316, 322 (D.C. Cir. 1989) ("a discriminatory atmosphere . . . could serve as circumstantial evidence of individualized discrimination."). However, the evidence here paints no such picture.

Furthermore, it is understandable that Georgetown would be concerned about an "aging faculty" to the degree that a spate of retirements could leave it short of faculty to teach the core curriculum.  As Levitin explained when he was deposed, "one of the concerns is that if we don't . . . do steady hiring in the business law area, that we . . . could find ourselves in a position where

we . . . are severely understaffed all of a sudden because . . . we are going to, just as an actuarial matter, have in the next ten years a wave of people likely retiring or leaving the faculty for other reasons." (Levitin Dep. at 205-06.) Similar facts were presented in another recent case in this jurisdiction, in which the plaintiff complained about statements regarding the need to "recruit younger broadcasters who would be around for years to come," in view of the fact that several broadcasters were approaching retirement. *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 38 (D.D.C. 2008), *aff'd*, *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009). In that case, the district court found that "the comments [plaintiff] cites were not discriminatory on their face, and nothing in the record indicates that the failure to hire him was motivated by 'inaccurate and stigmatizing stereotypes' about members of his protected classes, such as a lack of productivity or decreased competence." *Id.*; *see also Breen v. Mineta*, No. 05-654, 2005 WL 3276163, at *4-5 (D.D.C. Sept. 30, 2005) (employer's statement that "[a]lmost 40 percent of flight service specialists [are] eligible to retire" was not evidence of discrimination because it identified "the probability of attrition of large numbers of experienced personnel in the foreseeable future" but no "inaccurate and denigrating generalizations about age").[7]

Finally, Spaeth mischaracterizes the undated Bratton memo. Spaeth suggests that "[t]hat memo explained that the Entry Level Appointments Committee was to focus on maintaining 'young cohorts' in the faculty," which he takes to mean that older faculty should not be hired. (*See* Pl. Opp. at 24.) When read in context, however, it is clear that far from making a case for hiring only young people, Bratton's memo sought to lay out competing institutional priorities in hiring. He noted, in the process of describing *one* of those priorities – entry-level hiring – that

---

[7] The Court rejects Spaeth's assertion that the demographic analyses bear any resemblance to the spreadsheet at issue in *Barnett v. PA Consulting Group, Inc.*, No. 11-7136, *slip op.* at *6 (D.C. Cir. May 7, 2013), for the reasons discussed *infra* at 35-36.

"[m]ost peer group schools pride themselves on their young cohorts" and described

Georgetown's entry-level hiring as "very successful of late."  (Pl. Resp. SOF ¶ 28 (quoting

Bratton Memo, Ex. 15 to Levitin Dep., at 1).)  As with many of the examples of "ageist remarks"

discussed below, Bratton is using "young" as synonymous with "entry-level" because in most

cases that is the reality.  As Pillard testified, "people who want to be a [p]rofessor do often

identify that relatively early in their career and so . . . we see a lot more entry level people in

the[ir] 30s than in their 60s[.]"  (Pillard Dep. at 53; *see also* Levitin Tr. at 266 (a "typical law

professor starts a career in their 30s").)  An argument for hiring "young scholars," when most

applicants for entry-level positions have historically been young, does not, in and of itself,

signify that he is biased against older candidates.  *See, e.g., Henson*, 61 F.3d at 276 ("[T]he

hiring of young employees into entry level positions is reasonable since younger people are more

apt to apply for such positions.").  Thus, whether Pillard was the sole decisionmaker, as argued

by Georgetown, or whether the hiring process was influenced by Bratton and Levitin, as argued

by Spaeth, is of little consequence since the evidence does not support Spaeth's claim of

"pervasive bias against older applicants for entry level positions at Georgetown."  (Pl. Opp. at

24.)

       3.     *"Ageist Remarks"*

In addition to relying on Levitin's demographic analyses and Bratton's memo, Spaeth

argues that remarks by members of the Entry Level Appointments Committee, Levitin, and other

faculty members demonstrate that "age bias improperly permeated Georgetown's hiring

process."  (*Id*. at 38.)  The Court does not agree.  While Spaeth has presented evidence of age-

related remarks, he consistently takes those remarks out of context and misconstrues their

meaning, or he mistakes merely descriptive statements for derogatory remarks.  The bulk of the

"ageist" remarks that Spaeth points to are merely descriptions of young people as young. Additionally, reference to age has some relevance in the academic hiring context, insofar as it constitutes a proxy for years producing scholarship, allowing comparisons within "rough age cohorts" of the relative complexity and quantity of the scholarship.  (*See* Levitin Dep. at 266-67.)

For example, Spaeth mentions a reference to one candidate as "a talented and productive young scholar."  (*See* Pl. Resp. SOF ¶ 76(b) (citing Pillard Dep. at 278 & Ex. 48 to Pillard Dep., at 11).)  It is not discriminatory to call a 31-year-old academic a "young scholar."  It is descriptive, and also suggests that while "productive," the individual is likely to have a more limited body of work than a professor who has been producing scholarship for thirty years.  Nor, in describing other candidates as a "young man," "young tax scholars," "three relatively young, quite promising lawyers," and so on, does Georgetown demonstrate a bias in favor of hiring young candidates.  (*See* Pl. Opp. at 14-17)  The general pool of applicants tends to be relatively young, those selected for interviews were young, and those hired were young.  That candidates who *are* young are described as being young does not provide sufficient evidence for a jury to find that Georgetown has a discriminatory hiring process.  These descriptive terms do not come close to the discriminatory comments at issue in the cases cited by Spaeth.  *See, e.g., Talavera v. Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011) (statement demonstrating discriminatory animus by a decisionmaker); *Kelly v. Airborne Freight Corp.*, 140 F.3d 335, 347 (1st Cir. 1998) (statement by decisionmaker expressing desire to "get rid of" older workers); *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984) (statement by decisionmaker indicating preference for hiring younger workers).

The remarks attributed to Georgetown faculty more closely resemble those in *Nyunt*, where the court found that supervisors' references to the successful applicant as "a star on the

rise" and "a rising talent" were not evidence of discrimination, based on the precept set forth by

Judge Posner: "We do not hold that any and all words in praise of youth expose an employer to a

trial under the age discrimination law." *See Nyunt*, 543 F. Supp. 2d at 38 (quoting *Shager v.

Upjohn Co.*, 913 F. 2d 398, 402 (7th Cir. 1990)); *see also Berquist v. Wash. Mut. Bank*, 500 F.3d

344, 351-52 (5th Cir. 2007) (comment about desire to "attract younger talent" was not evidence

of discriminatory intent but rather was "a broad statement not directed to any particular

employee about [supervisor's] management goals and remote in time from [plaintiff's] firing").

Spaeth focuses particularly on what he refers to as "ageist" remarks by Levitin.  The

Court has reviewed each of the comments and finds that in each instance they are merely

descriptive or have been taken out of context.  For example, Levitin engaged in an email

exchange with a colleague mocking another older colleague by referencing his dentures.  (*See* Pl.

Resp. SOF 76(c) (quoting Ex. 24 to Levitin Dep.).)  However, as Levitin explained during his

deposition, he was describing something that actually occurred, rather than using dentures in a

metaphoric sense to denigrate a colleague for his age.  (*See* Levitin Dep. at 285-91.)  In a list of

applicants that Levitin compiled during the 2011-12 hiring process, he described a few of them

as "older."  (Pl. Resp. SOF ¶ 76(d) (citing Levitin Dep. at 250, 252 & Ex. 20 to Levitin Dep.).)

That word was one among many varied descriptions of the candidates on the list, including joint

degrees they held, universities they attended, the focus of their scholarship, recommendations

received on their behalf, judges they clerked for, Georgetown faculty members' assessments, the

quality or quantity of their writing, whether they were already living in the area, their practice

experience, whether they should be considered as lateral candidates, and so on.  (*See id.*)  In

other words, there is no indication that these "older" individuals were being eliminated from

consideration based on their age; rather, they were on a list of candidates under consideration about whom notable characteristics were highlighted.

Levitin's list is distinguishable from the internal auditors' spreadsheet at issue in *Barnett v. PA Consulting Group, Inc*., No. 11-7136, 2013 WL 1876247, at *6 (D.C. Cir. May 7, 2013), notwithstanding Spaeth's contention to the contrary. (*See* Plaintiff's Notice of Supplemental Authority [ECF No. 105] ("Pl. Notice").) First and foremost, the *Barnett* spreadsheet was compiled as part of a process that culminated in Barnett's firing, while Levitin compiled his list during the 2011-12 hiring cycle and thus the list has nothing to do with Pillard not selecting Spaeth's application during the 2010-11 hiring cycle. Furthermore, the *Barnett* spreadsheet was compiled to assist with layoff decisions by comparing the productivity of current employees. Each employee's age was noted, and the Court of Appeals held that a "jury might infer that PA's leadership included age as a factor in its personnel decisions." *See id.* at 12. By contrast, Levitin's list was compiled to assist at the initial hiring stage by using shorthand descriptions to identify essentially unknown applicants. He did not consistently note candidates' ages, but rather noted that a few candidates were "older." In one instance, he noted that a candidate was "older with experience" and in another, noted that a candidate was "older" and had already been teaching at a different law school for several years. (Ex. 20 to Levitin Dep.) When viewed in context, no reasonable jury would view these notations as evidence of discrimination, thus distinguishing the instant case from *Barnett*, in which the Court of Appeals held that "a reasonable jury could find the spreadsheet to be probative of discrimination." *Barnett*, 2013 WL 1876247, at *6.

Spaeth fares no better with his citation to comments by Pillard, who everyone agrees was a key decisionmaker. While comments by a decisionmaker related to the hiring process can

constitute direct evidence of discrimination that will "generally entitle a plaintiff to a jury trial."
*Ayissi-Etoh*, 2013 WL 1352239 at *3 (quoting *Vatel*, 627 F.3d at 1247), none of the comments
attributed to Pillard are discriminatory and none relate directly to Spaeth or to Georgetown's
reasons for not offering him an interview.  Spaeth alleges that Pillard referred to a candidate as
"a boy," but when read in context, it is clear that she was referring to the fact that he is male and
expressing regret that there was not greater gender balance in the department.  (*See* Pillard Dep.
at 286.)  Spaeth also calls her to task for describing another candidate as a "puppy," a comment
made in jest during her deposition in response to the suggestion that "pick of the litter" indicated
age bias.  (*Id.*)  The remaining remarks by Pillard – primarily describing young individuals as
"young" – are similarly not evidence of discriminatory animus.[8]

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment will be granted.
An Order accompanies this Memorandum Opinion.

/s/

ELLEN SEGAL HUVELLE
United States District Judge

DATE: May 9, 2013

---

[8] Spaeth also asserts that "there exists substantial evidence of other conduct that is probative of
discriminatory intent in the hiring process for entry level law faculty positions."  (Pl. Opp. at 42.)
In particular, Spaeth alleges violations of Georgetown's Affirmative Action Policy and its Equal
Opportunity and Non-Discrimination in Employment Policy based on the assertion that
"Professor Pillard and Professor Levitin recorded and reported the gender and race or ethnicity of
the candidates on the short lists, and those given call back interviews, and the Entry Level
Appointments Committee, when reviewing a short list in 2010, disproportionately deleted white
males from further consideration."  (*Id.*)  However, these allegations of race and gender
discrimination against white males are unfounded, since Georgetown ultimately hired two white
males, and more importantly, they are simply not "probative evidence of discriminatory intent"
with respect to Spaeth's age claims.  (Pl. Sur-reply at 9.)  The Court of Appeals' recent decision
in *Barnett*, 2013 WL 1876247, does nothing to change this.  (*See* Pl. Notice at 3.)